IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Libbey Inc., et al.,                              Case No. 3:06 CV 2412

                          Plaintiffs,             MEMORANDUM OPINION
                                                  AND ORDER
              -vs-
                                                  JUDGE JACK ZOUHARY
Factory Mutual Insurance Company,

                          Defendant.


This case involves a dispute between Plaintiffs Libbey Inc. and Libbey Glass Inc. (Libbey)

which seek to recover under an "all-risk policy" issued by Defendant Factory Mutual Insurance

(Factory Mutual) .  The loss occurred when Libbey sustained damage to glass-forming machines,

which allegedly occurred due to excess calcium in a lubricating oil supplied by Prism Lubricants, Ltd.

(Prism).

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), because the citizenship of Libbey

and Factory Mutual is diverse and because the matter in controversy exceeds the sum of $75,000,

exclusive of interest and costs.

## FACTS

Libbey is a glass company headquartered in Toledo, Ohio.  Libbey's glass-forming machines

require a lubricating oil on all moving parts.  The oil is pumped from a main tank to 55-gallon oil

drums, then to a central distributor, and finally to individual oil injectors.  Libbey used Exxon-Mobile

Mobilarma 534 as the lubricating oil until 2001 when Exxon-Mobile discontinued production. Libbey then turned to Prism which agreed to produce an identical lubricating oil (RP-30) using the same chemical make-up. The RP-30 was first used in Libbey's machines in July 2001.

Beginning in 2003, Libbey began experiencing unusual and unexpected damage to the glass-forming machines and, in turn, investigated the cause. In May 2004, Libbey discovered the RP-30 contained six times the amount of calcium used in the Mobilarma 534 oil. Libbey found the excess calcium formed deposits on the injector pistons and damaged oil seals. Specifically, the calcium deposits clogged the injectors and prohibited oil from reaching the moving parts. This resulted in machine failure and a slow-down in production. Upon discovering the problem, Libbey stopped using the misformulated oil, switched to another correctly formulated oil from Prism, and repaired the damage to machines and components.

From July 2003 until the present, Factory Mutual issued an "all-risk policy" (the Policy) to Libbey, providing coverage for property damage as well as business interruption loss, except as specifically excluded (Zipfel Aff. Exs. A, B, C). Libbey notified Factory Mutual of the loss caused by the misformulated oil in August 2004. Factory Mutual conducted an investigation of Libbey's claim and in September 2006 denied coverage based upon Policy exclusions and the $250,000 per occurrence deductible clause. Libbey filed suit in October 2006. Factory Mutual filed a Motion for Summary Judgment (Doc. No. 19) and Libbey filed a Cross-Motion for Partial Summary Judgment (Doc. No. 24). The cross-motions focus on the application of certain Policy exclusions, and the number of "occurrences" which in turn impacts the application of the Policy deductible. Factory Mutual also filed a Motion to Stay and Bifurcate Libbey's Bad Faith Claim (Doc. No. 22) which Libbey opposes (Doc. No. 31).

2

## POLICY EXCLUSIONS

The Policy states in pertinent part:

PROPERTY DAMAGE - SECTION B

5.    EXCLUSIONS

The following exclusions apply unless specifically stated elsewhere in this Policy. . . .

C.    This Policy excludes the following, but if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause . . .

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

D.    This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1) contamination including but not limited to the presence of pollution or hazardous material.

## SUMMARY JUDGMENT STANDARD

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. The material facts are not in dispute, nor is the applicability of Ohio law (Def.'s Mot. Summ. J. 2-5; Pls' Opp. 1-5). The only issue is whether, under Ohio law, the exclusion provisions of the Policy are applicable to the undisputed facts. Even if there are two possible interpretations of the Policy exclusions, summary judgment in favor of Libbey is appropriate under Ohio law. *City of Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St. 3d 186, 187 (2006); *Westfield Ins. Co. v. Galatis*, 100 Ohio

St. 3d 216, 220 (2003).  The parties are in agreement that the issue of exclusions is one of law and that

summary judgment is appropriate. Fed.R.Civ.P. 56(c).

## DISCUSSION

The interpretation of insurance contracts is a matter of law, and they "must be construed in

accordance with the same rules as other written contracts." *Hybud Equipment Corp. v. Sphere Drake*

*Ins. Co.,* 64 Ohio St. 3d 657, 665 (1992); *Sharonville*, 109 Ohio St. 3d at 187.

As the Ohio Supreme Court stated in *Westfield Ins. Co.*, 100 Ohio St. 3d at 219 (citations

omitted):

> We examine the insurance contract as a whole and presume that the intent of the parties
> is reflected in the language used in the policy. We look to the plain and ordinary
> meaning of the language used in the policy unless another meaning is clearly apparent
> from the contents of the policy. When the language of a written contract is clear, a
> court may look no further than the writing itself to find the intent of the parties. As a
> matter of law, a contract is unambiguous if it can be given a definite legal meaning.

When determining the legal meaning, "words and phrases used in an insurance policy must be given

their natural and commonly accepted meaning, where they in fact possess such meaning, to the end

that a reasonable interpretation of the insurance contract consistent with the apparent object and plain

intent of the parties may be determined." *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St. 2d 166,

167-68 (1982) (citing *Dealers Dairy Products Co. v. Royal Ins. Co.*, 170 Ohio St. 336, para. one of

the syllabus (1960)). Ohio courts have found the burden is upon the insurer to establish its proposed

interpretation is the only reasonable interpretation possible. *Andersen v. Highland House Co.*, 93 Ohio

St. 3d 547, 550 (2001); *St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 993 (6th

Cir. 2003).

If, however, the word or phrase is reasonably susceptible of more than one meaning, it is

ambiguous. *Id.* at 992. When the contract term is ambiguous and there are two reasonable

interpretations, the ambiguity is interpreted against the drafter/insurer and in favor of the insured. *Sharonville*, 109 Ohio St. 3d at 187; *Westfield Ins. Co.*, 100 Ohio St. 3d at 220.

### 1.    Faulty Material Exclusion

Factory Mutual alleges the RP-30 oil was "faulty material" and excluded under Policy Exclusion (5)(C)(1), which denies coverage for "[f]aulty workmanship, material, construction, or design from any cause."

The term "material" is not defined in the Policy and therefore the Court must determine the natural and commonly accepted definition.  "Material" is defined as "the elements, constituents, or substances of which something is composed or can be made." *Merriam-Webster On-Line*, *available at* http://www.m-w.com/dictionary/material (June 18, 2007).  Based at least in part on this definition, "material" has been further defined by one district court as "an element or constituent substance of a larger item." *Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274, 283 (D. Conn. 2005) (holding a tram car is not a "material" of an airport tram system).

The parties argue opposing interpretations of "faulty material."  Factory Mutual asserts the lubricating oil is an element or constituent substance of the glass-forming machine because it is an essential component and the machines cannot operate without the oil. Libbey contends that lubricating oil, which is not part of the machine's physical structure, is not part of the larger item.

Factory Mutual cites two cases in which the courts found the "faulty material" exception applied: *Falcon Products, Inc. v. Ins. Co. of State of Pa.*, 615 F. Supp. 37 (E.D. Mo. 1985) and *Sapiro v. Encompass Ins.*, No. C 03-4587, 2004 WL 2496090 (N.D. Cal. Nov. 2, 2004).  Both cases are distinguishable. In *Falcon Products*, the faulty materials were metal pellets used to construct metal tables, and in *Sapiro*, the faulty materials were pieces of lumber, containing dry rot, used in home

construction. *Falcon Products*, 615 F. Supp. at 39; *Sapiro*, 221 F.R.D. at 522.  In these cases, the metal and wood are clearly substances of which the table and home, respectively, are composed.

The meaning of "material" clearly encompasses the metal from which a machine is made:  the belt, seals and other miscellaneous hardware attached to, and part of, the machine.  The Court agrees with these holdings in *Falcon Products* and *Sapiro*.  However, these cases do not help decide whether the common meaning of "material" includes such a transient item as oil which, while necessary to run the machine, in ordinary usage is not considered an attached part of a machine.

The Court notes, while the oil was added after the machine was constructed, this fact is not necessarily determinative of the meaning of the exclusion.  Materials used in construction or repair can be clearly covered by the exclusion.  For example, an additional protective shield or a belt replacement on the machine would still be "materials" of the machine, despite their later addition.

The difference between the belt, gears, and seals on the machine, and the oil used in the machine, is that the oil never becomes part of the machine.  The oil, even after its addition to the machine, retains its own identity, not unlike gasoline needed to run a car is not considered part of a car.  The parties agree the machine is useless without the lubricating oil, and neither can the conventional car operate without gasoline.  However, being essential to the operation does not mean the same as comprising or making up the machine.  The Court finds that lubricating oil is not "material" under the ordinary and natural meaning, and therefore the loss is not excluded under the "faulty material" exclusion.[1]

---

[1]

Even if the Court did not find lubricating oil to be outside the ordinary meaning of "material," Factory Mutual has not shown that lubricating oil clearly and unambiguously falls within the exclusion.  The exclusion for "faulty material" is reasonably susceptible to more than one meaning, and under Ohio law such exclusions must be interpreted against the drafter. *Sharonville*, 109 Ohio St.3d at 187; *Westfield Ins. Co.*, 100 Ohio St. 3d at 220. Thus, the exclusion would still not apply.

6

### 2.      Deterioration and Wear and Tear Exclusions

Factory Mutual also alleges the damage to Libbey's machines is "deterioration" and "wear and tear" and appropriately excluded under Policy Exclusion (5)(C)(3), which denies coverage for "deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect." Again, Factory Mutual's Policy does not include a definition of "deterioration" or "wear and tear."

### Deterioration

The deterioration exclusion is only briefly mentioned in the parties' briefing.  Factory Mutual argues the deterioration exclusion is clear and unambiguous: namely, the excess calcium accelerated the deterioration of the glass-forming machines.  Factory Mutual, however, does not discuss the definition of "deterioration."  Libbey contends the plain and ordinary meaning of "deterioration" is limited to damage resulting from the failure of normal maintenance or a manufacturing defect, and does not include damage caused by the routine introduction of a misforumulated oil.

In *Webster's Third New International Dictionary*, "deterioration" is defined as "the action or process of deteriorating or state of having deteriorated: gradual impairment." *Webster's Third New International Dictionary* 616 (1986).  *Cavalier Group v. Strescon Industries, Inc.*, 782 F. Supp. 946, 955-56 (D. Del. 1992), used this definition to define "deterioration" in the context of an all-risk insurance policy exclusion. The court found the ordinary and usual definition of  "deterioration" includes the gradual worsening of an object due to natural causes. *Id.*  The court also noted the context of the word "deterioration" also suggested the definition be limited to normal and inevitable occurrences. *Id.* at 956.  Like the Policy in this case, in the *Cavalier* policy, "'deterioration' was listed in conjunction with 'wear and tear,' 'latent defect,' and 'inherent vice.' All these listed categories

7

relate to normal and inevitable occurrences, not occurrences like negligence that are within someone else's control." *Id.*

Based on this definition,[2] the court found the crumbling of balconies occurring faster than ususal, though still over a period of years, due to the negligence of a third party was not clearly "deterioration." *Id.*  Because two reasonable interpretations existed, the definition was ambiguous as a matter of law. *Id.*

The Court agrees with the analysis found in *Cavalier Group*, and finds the definition of "deterioration" is at least ambiguous, and one reasonable interpretation of the word requires a gradual worsening due to natural causes.  Here, the damage from lubricating oil cannot be said to be a gradual worsening due to natural causes.  In its brief, Factory Mutual admits the calcium **accelerated** the damage.  The damage was also caused by non-natural causes (e.g. misformulated oil) and the context of the Policy exclusion implies exclusion of normal and inevitable occurrences only.  Therefore, as Libbey's definition of "deterioration" is reasonable and Factory Mutual has not shown the loss is clearly within the exclusion, "deterioration" is ambiguous and must be interpreted in favor of Libbey.

Wear and Tear

Turning to the wear and tear exclusion, again the Policy does not define "wear and tear" nor does it indicate any technical meaning of the phrase.  The Court must determine its common and natural meaning.  The Sixth Circuit has recognized that wear and tear exclusions are common in all-

---

2

In *Cavalier*, the court also considered the definitions of "deterioration" in the *American College Dictionary* (1970), and *Black's Law Dictionary* (6th ed. 1990).  The court held, however, that the *American College* definition did "little to advance the inquiry because its definition of 'deterioration' is neither fixed in severity nor in time. It merely defines 'deterioration' as some lessening in value."  *Cavalier*, 782 F. Supp at 955. Additionally, while the *Black's Law* definition of "deterioration" relied on in *Cavalier* supports this Court's conclusion, subsequent editions of *Black's Law* do not include an entry for "deterioration."  Therefore, this definition is removed from the Court's analysis.

8

risk policies and that "Courts frequently interpret wear and tear exclusions to connote the popular meaning of the expression, and may imply adjectives such as 'ordinary' and 'natural' to limit the breadth of exclusions." *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 350 (6th Cir. 2005) (citing *Cyclops Corp. v. Home Ins. Co.*, 352 F. Supp. 931, 936 (W.D. Pa. 1973) ("We do not find that the modifiers 'ordinary' or 'natural' add anything to the commonly understood meaning of 'wear and tear.' . . . We find the use of the modifiers 'natural' or 'ordinary' to be a typical lawyer's redundancy.")); *see also American Heritage Dictionary of the English Language*, 1948 (4th Ed. 2000) ("wear and tear" is defined as "Loss, damage, or depreciation resulting from ordinary use and exposure"). Additionally, as with "deterioration," the context of the exclusion is limited to events of a normal and inevitable nature.

This conclusion is supported by the common meaning of "wear and tear" used in lease situations where "[t]he usual and ordinary meaning ascribed to the phrase 'wear and tear' is that deterioration of condition or depreciation in value attributable to normal and reasonable use of an object. What is normal and reasonable use depends upon the service for which the object is intended." *Ohio Environmental Development Ltd. Partnership v. Envirotest Sys. Corp.*, 478 F. Supp. 2d 963, 970 (N.D. Ohio 2007).

The Court finds unpersuasive the cases cited by Factory Mutual supporting a broader definition of "wear and tear." Both *Gilbane Bldg. Co. v. Altman Co.*, 2005-Ohio-984 (Ohio Ct. App. 2005), and *Heban v. Auto-Owners Ins. Co.*, 2003-Ohio-4218 (Ohio Ct. App. 2003), hold that the speed at which rust and corrosion occurred is irrelevant to a determination of whether the damage is excluded as "rust" or "corrosion." These holdings are distinguishable. First, rust and corrosion, natural occurrences, are not at issue in this case. Second, whether or not the Policy excludes both fast and slow forming rust

9

and corrosion does not change the common and ordinary meaning of "wear and tear" or "deterioration," where the definitions of the words themselves imply a gradual and normal loss. The holdings of *Gilbane* and *Heban* are therefore not relevant to the common meaning of the exclusions at issue in the case at hand.

The common meaning of "wear and tear" is limited to the damage caused in an ordinary, natural or normal course. The Court finds the damage caused by the misformulated oil does not constitute "wear and tear" in its normal sense as the machine is not normally or ordinarily exposed to excess calcium. Therefore, because the damage alleged in this case does not constitute "wear and tear" under its ordinary meaning, coverage is not excluded under the "wear and tear" Policy exclusion.

### 3. Contamination Exclusion

The Policy excludes "contamination including but not limited to the presence of pollution or hazardous material." Factory Mutual alleges the loss is excluded as a "contamination" under Policy Exclusion (5)(D)(1) Again, the Policy does not define "contamination."

Factory Mutual asks the Court to define "contaminate" as "to render unfit for use by the introduction of unwholesome or undesirable elements." *Hartory v. State Auto. Mut. Ins. Co.*, 50 Ohio App. 3d 1 (1988) (methane gas from landfill seeped into home and water well was an undesirable element and rendered the well unfit for use); *Ho v. State Farm Fire & Cas. Co.*, 2005-Ohio-5452, 2005 Ohio App. LEXIS 4927 (2005) (chemical applied to remove smoke smell from a house made the home uninhabitable); *J.L. French Auto. Castings, Inc. v. Factory Mut. Ins. Co.,* 9479, 2003 WL 21730127 (N.D. Ill. July 23, 2005) (machine operator crushed, resulting in contamination of lubricating oil with human body parts). Libbey's proposed definition of "contaminate" is: "a harmful or injurious foreign substance or an impurity that is not normally present in a given solid, liquid, or gas."

10

Without a definition included in the Policy, the Court must again determine the common meaning of "contamination." *Merriam-Webster's On-Line Dictionary* defines "contaminate"as: "to soil, stain, corrupt, or infect by contact or association," as well as "to make inferior or impure by admixture," and "to make unfit for use by the introduction of unwholesome or undesirable elements." *Merriam-Webster's On-Line Dictionary*, *available at* http://www.m-w.com/dictionary/contaminate (June 18, 2007). *Merriam-Webster's* goes on to state "contaminate implies intrusion of or contact with dirt or foulness from an **outside source**." *Id.* (emphasis added).  The definition of "contaminate" implies the infusion of an ingredient not normally part of the substance, and based upon this definition, a substance cannot be said to be "contaminated" if only the elements that regularly comprise it are involved, even if in an improper ratio.  It would be a stretch to say the misformulated oil came into contact with the excess calcium, or was exposed to excess calcium.  Nor is it obvious that calcium is poisonous or polluting, or that the addition of calcium made the oil impure, infected or corrupt as the oil itself required some amount of calcium.  It is undisputed that the oil is a necessary lubricant for the machines, and calcium is always a part of the formula.  Therefore, it is not clear that the oil itself or the calcium could be considered a "contaminate."

Both *Hartory* and *J.L. French*, cited by Factory Mutual, involve the addition of foreign objects as "contaminates."  *Hartory* involved methane gas in a private home, an element not normally found in household air. *J.L. French* involved human body parts in a die lubricant.

*Ho*, the third case cited by Factory Mutual, is similar to the instant case in one respect:  the chemical was intentionally applied in the home to remove the smell of smoke after a fire, just as the calcium was intentionally applied to the oil. However, the chemical is not a usual part of the home and, further, *Ho* does not include an analysis explaining why the chemical application was a

11

"contamination." The court merely held the initial denial of coverage by the insurance company was not done in bad faith. Therefore, *Ho* is not helpful.

The Court finds helpful the analogy of chlorine in a swimming pool. Chlorine in a swimming pool is expected just as calcium in the lubricating oil is expected. However, if too much chlorine is used, the pool is not considered "contaminated." Chlorine is not an "unwholesome or undesirable element" in swimming pool water. It is not a "foreign substance" or an "impurity that is not normally present" in swimming pool water. The same analysis can be said to apply calcium in lubricating oil.

In the absence of relevant case law, the Court returns to the dictionary definitions detailed above, and based on these definitions, the definition of "contamination" requires the addition of a substance not normally found in the lubricating oil. Libbey intended some calcium to be included in the lubricating oil and, therefore, an excessive amount of calcium in the oil cannot be considered a "contamination." Accordingly, the contamination exclusion does not preclude coverage under the Policy.

### 4.    Number of Occurrences Resulting From Misformulated Lubricating Oil

Because the Court finds the damage is not excluded by the Policy, Libbey moves for summary judgment on the allegations in Paragraph 31 of the Complaint concerning the number of "occurrences" (Doc. No. 25).[3] This determination impacts Libbey's ability to meet the $250,000 deductible, as none of the damaged machines or components individually meet the deductible. The Policy states: "In each

---

[3]

Paragraph 31 states:

> In addition, despite the fact that the damages suffered by Libbey are the result of one discrete event, namely the use of the misformulated oil in Libbey's machinery, FM Global asserted in its denial of coverage that each alleged incident constitutes a separate loss occurrence, none of which exceeds the $250,000 deductible.

12

case of loss covered by the Policy, the Company will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible" (Policy A-11).  An "occurrence" is not defined in the Policy.

Factory Mutual first objects to the use of partial summary judgment on this issue as it is a non-dispositive issue.  However, Federal Civil Rule 56(d) "authorizes entry of partial summary judgment and permits the court to direct further proceedings in an action as are just." *Johnston v. Dowling*, 765 F.2d 145, 1985 WL 13277, at *2 (6th Cir. May 9, 1985); *see also McDonnell v. Cardiothoracic & Vascular Surgical Associates, Inc.*, No. C2-03-0079, 2004 WL 1234138, at *1 (S.D. Ohio May 27, 2004) ("it is apparent that Rule 56 allows the Court to resolve significant questions of law pretrial so that a court can focus the litigation on the true matters in controversy").  The Court finds determining the number of "occurrences" would expedite the litigation and conserve judicial resources, and therefore the Court will consider Libbey's Motion for Partial Summary Judgment.

Libbey claims losses for forty-two separate incidents, which caused downtime at nine machines over twenty-two months.  An "occurrence" is ordinarily understood to be "something that takes place," especially "something that takes place unexpectedly and without design." *Webster's Third New International Dictionary* 1561 (1986); *see also Black's Law Dictionary* 1109 (8th ed. 2004) ("something that happens or takes place; specif., an accident, event, or continuing condition that results in . . . property damage that is neither expected nor intended from the standpoint of an insured party").  In construing "occurrence" in insurance policies, while there appears to be no Ohio case law directly on point, the majority of cases across the country, including federal courts applying Ohio law, define an "occurrence" based on the underlying cause or causes of damage, not the number of injuries or claims.  *Parker Hannefin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 832 (N.D. Ohio 2006);

13

*Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515, 1525 (D.D.C. 1984) (applying Ohio law and the causation approach); *International Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F. Supp. 917, 923 (S.D. Ohio 1994) (in a case involving Ohio law, the court recognized the overwhelming authority which favors the causation approach, with multiple losses constituting one "occurrence"). The case of *Parker Hannefin*, despite interpreting a different policy provision, is particularly instructive. The court recognized the overwhelming authority which supports a "focus on the underlying *circumstances* which resulted in the personal injury and claims for damage rather than each individual claimant's *injury*" when calculating the number of "occurrences." *Parker Hannifin Corp.*, 445 F. Supp. 2d at 832 (emphasis in original).

The underlying cause of Libbey's losses is the same: namely, Prism misformulated the oil and the oil was injected into the glass-forming machines. Factory Mutual does not contest that it was the excess calcium which prevented the proper lubrication of the machines and caused premature wear to the machines (Def.'s Mot. Summ. J., Uncontested Facts 5, p. 3). Therefore, under the majority approach, Libbey's loss from the misformulated oil would constitute one "occurrence."

Factory Mutual, however, argues the Policy's plain language states an "occurrence" results after each **single event** of covered physical loss or damage, and the Court should enforce the contract language as written by the parties. *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St. 2d 166, 168 (1982). If "occurrences" were determined by single events rather than the underlying circumstances, each of the forty-two downtime events would be a separate "occurrence."

The Policy does not state that each event is a separate "occurrence." Instead, Factory Mutual focuses its argument on the Policy's use of the word "loss." The Policy frequently refers to "loss" in

14

the singular, and Factory Mutual asserts the term "loss" should be considered synonymous with "occurrence." Factory Mutual further argues that since "loss" is frequently used in the singular and a loss is calculated after each event, so should an "occurrence."

Factory Mutual cites to numerous Policy provisions which include "loss" to support its argument. Such provisions include the requirements to submit a proof of loss for each incident within ninety days, to calculate loss individually for each downtime incident, and to evaluate the loss on the date of the loss for adjustment purposes.

Factory Mutual's argument fails because the Policy does not clearly indicate one loss, or one event, equals one "occurrence." The Policy states, "In each case of loss covered by the Policy, the Company will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible." (Policy A-11). This provision limits the deductible to a single "occurrence," but does not limit the deductible to a single loss, nor does it limit a single "occurrence" to a single loss. It is entirely reasonable to interpret this provision to allow for multiple events creating multiple losses, which together are part of a single cause or "occurrence." As Factory Mutual notes, there are many policy provisions which focus on each individual loss, however that is **not** the case when the Policy discusses the application of the deductible to an "occurrence."

Here, the plain language of the Policy has not defined an "occurrence" as a single event. Generally, courts have interpreted an "occurrence" to be defined by the causation. Here, the causation for the alleged loss appears to be the same. Therefore, these related losses are part of the same "occurrence." To the extent the damage is related to the use of Prism oil and occurred during the Policy's coverage, it constitutes one "occurrence" for the application of the $250,000 deductible.

**5.    Libbey's Motion for Partial Summary Judgment on Factory Mutual's Second Affirmative Defense**

Factory Mutual's Second Affirmative Defense (Answer ¶¶ 17-18) states Libbey's losses are excluded by the Policy's exclusionary provisions.  Libbey asks the Court to find the plain meaning of the exclusions do not preclude coverage.  For the reasons stated above, the Court finds the "faulty material," "wear and tear," "deterioration," and "contamination" exclusions, relied upon by Factory Mutual, do not exclude Libbey's losses due to the misformulated Prism oil.  Summary judgment is granted in favor of Libbey as to the losses arising out of the misformulated oil under these specific exclusions.  This holding, however, does not preclude future arguments that specific losses were not due to misformulated oil, or that an exclusion not discussed above applies to losses arising out of the misformulated oil.

**6.    Factory Mutual's Motion to Stay and Bifurcate Libbey's Bad Faith Claim**

Factory Mutual requests the Court stay and bifurcate Libbey's Bad Faith Claim because allowing Libbey to discover pre-suit attorney-client communications would give Libbey the benefit of using these communications in prosecution of the breach of contract claims, as well as prejudice Factory Mutual's ability to defend against the breach of contract claims (Doc. No. 22). "Trial courts have broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Gettings v. Bldg. Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 304 (6th Cir. 2003).  "A court may bifurcate a trial 'in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy.'" *Wilson v. Morgan*, 477 F.3d 326, 339 (6th Cir. 2007) (citing Fed. R. Civ. P. 42(b).

Factory Mutual relies extensively on *Boone v. Vanliner Ins. Co.*, 91 Ohio St. 3d 209, 213-14 (2001) ("in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover

16

claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage," however, "if the trial court finds that the release of this information will inhibit the insurer's ability to defend on the underlying claim, it may issue a stay of the bad faith claim and related production of discovery pending the outcome of the underlying claim"); and *Garg v. State Auto. Mut. Ins. Co.*, 155 Ohio App. 3d 258, 266 (2003) (staying discovery on the bad faith claim and bifurcation of the trial was necessary to prevent prejudice to insurer when discovery on bad faith claims would impact insurer's ability to defend against breach of contract and unfair claims practices claims).  Libbey relies on *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, No. 1:03 CV 1322, 2004 U.S. Dist. LEXIS 28795 (N.D. Ohio Feb. 9, 2004) (motion to stay the bad faith claim denied because defendants asserted the bad faith claims and contract claims did not show discovery on the bad faith claims would inhibit defendants' ability to defend against the contract claims; motion to bifurcate denied as premature until after the simultaneous discovery on the contract and bad faith claims is complete).

The Court finds *Bondex* distinguishable.  In *Bondex*, the court specifically noted defendants had repeatedly asserted the fact discovery necessary for the contract claims and for the bad faith claims were not interrelated. *Id.* at *12-13.  Based on this assertion, the court "found it hard to imagine how the discovery of such information would inhibit defendants [sic] ability to defend." *Id.* at *13.  Here, Factory Mutual asserts the opposite, that the breach of contract claims and the bad faith claims are closely interrelated because the denial of coverage is central to both types of claims.  In *Bondex*, the court also considered judicial economy and efficiency, and determined staying discovery would create unnecessary duplication, delay and expense. *Id.* at *17.  However, the court noted the unusual nature of the case and its already extended scheduling order was a compelling reason for the court to find

17

considerations of judicial economy to outweigh any prejudice to the defendants.  Here, this case is a more typical coverage dispute with a bad faith denial, a fact pattern more akin to the cases of *Boone* and *Garg* where the courts found a stay and bifurcation appropriate.  There are no unusual circumstances or extended litigation schedules to cause considerations of judicial economy to weigh more heavily in favor of Libbey.

While the Court recognizes a stay and bifurcation may extend the length of litigation, and perhaps cause some duplication and extra expense, the Court finds the potential prejudice to Factory Mutual outweighs any decrease in judicial economy or efficiency.  Furthermore, the Court's past practice is to minimize any inconvenience by scheduling a thirty-day discovery period and trial for the bad faith claims immediately following the trial of the breach of contract claim.  The attorney-client communications Libbey would discover if this Motion is denied may be relevant to determine whether Factory Mutual acted in bad faith; however, they may also be highly relevant to Factory Mutual's defense of the breach of contract claim.  *See Garg*, 155 Ohio App. 3d at 267.  Allowing Libbey access to the communications would give Libbey an advantage in litigating the breach of contract claim, and "[t]o require [Factory Mutual] to divulge its otherwise privileged information prior to a resolution of those other claims would unquestionably impact [Factory Mutual's] ability to defend against them." *Id.*

The Court also notes Libbey may still challenge Factory Mutual's claims that documents are privileged and are interrelated to both the breach of contract claims and bad faith claims, and may bring these disputes to the Court's attention.  As the court in *Bondex* stated, both the grant of a stay and the denial of a stay would "present this Court with the possibility of a resource-intensive management of discovery, though it is normal practice that the parties make good faith efforts to

18

resolve discovery issues without Court intervention." *Bondex Int'l, Inc.*, 2004 U.S. Dist. LEXIS 28795, at *16 n.8.

For all the above reasons, the Court finds it appropriate to stay and bifurcate Libbey's claim for bad faith until the breach of contract claim has been adjudicated.

**CONCLUSION**

Factory Mutual's Motion for Summary Judgment (Doc. No. 19) is DENIED.  Libbey's Cross-Motion for Partial Summary Judgment (Doc. No. 24) is GRANTED.  Factory Mutual's Motion to Stay and Bifurcate Libbey's Bad Faith Claim (Doc. No. 22) is GRANTED.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

June 21, 2007

19